# SEALED

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

SEP – 4 2018

JULIA C. DUDLEY, CLERK
BY: _Q. Blaylock_
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

for the

Western District of Virginia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH (276) 613-3680 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON

)
)
)
)
)
)

Case No. 1:18mj117

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____New York_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 242 | Deprivation of Rights Under Color of Law |
| 18 USC 1512(b) | Obstruction of Justice; Witness Tampering and inducing the Destruction of |
| 18 USC 1001(a)(2) | Evidence; Materially False Statements to the Government. |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Micah J. Childers, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/4/18

_____
*Judge's signature*

Hon. Pamela Meade Sargent, U.S. Magistrate Judge
*Printed name and title*

City and state: Abingdon, Virginia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
(276) 613-3680 THAT IS STORED AT
PREMISES CONTROLLED BY VERIZON

Case No. _____

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, MICAH J. CHILDERS, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Verizon, a wireless provider headquartered at 140 West Street, New York, New York. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. I have been employed as a Special Agent with the FBI for approximately 8 years. I am currently assigned to the Richmond Division, Bristol Resident Agency (BRA), located in Bristol, Virginia. Prior to working in the BRA, I was assigned to the Atlanta Division, Rome Resident Agency (RRA), located in Rome, Georgia, and was the coordinator for the Northwest Georgia Criminal Enterprise Task Force, an FBI Safe Street Task Force, investigating violent crimes, illegal narcotics trafficking, and illegal gang activity. I have served as the case agent on

multiple terrorism investigations, to include a domestic terrorism investigation involving explosive devices. I have taken part in numerous federal, state, and local investigations concerning international and domestic terrorism, document and identity fraud, financial fraud, cybercrimes, controlled substance violations, public corruption, civil rights violations and firearms offenses.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. §§ 242 (Deprivation of Rights Under Color of Law), Title 18 U.S.C. §§ 1512 (b)(1) and (b)(2)(B) (Obstruction of Justice; Witness Tampering and inducing the Destruction of Evidence), and Title 18 U.S.C. §§ 1001 (a)(2) (Materially False Statements to the Government), more particularly described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## FACTS SUPPORTING PROBABLE CAUSE

6.     On August 3, 2018, Investigators interviewed confidential witness one (CW1). CW1 provided the following information:

2

Following a 2016 arrest for shoplifting in Tazewell County, Virginia, CW1 was opened as a confidential informant for Shade Workman, Virginia State Police Special Agent and Commander of the Drug Task Force located in Tazewell County, Virginia. Workman instructed CW1 that no matter how many busts you do, five or five hundred, if you want to be with your kids, you are going to do this my way. Over the next year, Workman and CW1 had sex six times immediately before or after CW1 purchased illegal drugs at the direction of Workman, and at least ten times outside of CW1's work for the task force. April of 2017, CW1 was released from incarcerated in Tazewell County with the stipulation requiring CW1 assist Drug Task Force operations. CW1 moved from the area, due to the fear that CW1 would again be required to have sex with Workman.

7. On August 6, 2018, confidential witness two (CW2) was interviewed. CW 2 provided the following information:

The beginning of May, 2017, CW2 gave a ride to witness one (W1, W1 has not yet been interviewed by law enforcement due to concerns of potential destruction of evidence and witness tampering) who claimed to be having sex with a cop. When CW2 arrived at the located provided, W1 exited CW2's vehicle and entered a grey truck. CW2 observed the male who was driving the grey truck, as the driver's side window was down. In December 2017, CW2 was arrested, for an outstanding warrant for the distribution of illegal drugs, during a law enforcement round-up. CW2 was brought into an interview room, where only Workman was present. CW2 recognized Workman as the driver of the truck from May 2017. Workman told CW2 the charges filed against CW2, and asked if CW2 knew who got CW2, meaning who had worked as a confidential informant when CW2 sold illegal drugs. CW2 said," Yes, absolutely. You're fucking her." Workman instructed CW2 that CW2 cannot touch the confidential informant, and that the confidential informant is protected like the police.

8. On August 7, 2018, confidential witness three (CW3) was interviewed. CW3 provided the following information:

In 2016, CW3 was arrested for shoplifting. After the arrest, CW3 was approached by Workman to work for the drug task force. CW3 signed up with the drug task force in order to receive credit in sentencing. Workman requested to meet CW3. Workman arrived at the meeting alone, and CW3 believed that Workman was trying to set up CW3 on other charges. Subsequent meetings resulted in Workman having sex with CW3 in Workman's police issued vehicle and in the drug task force office space. August of 2016, Workman also met CW3, at the Super 8 Hotel located in Richlands, Virginia, for the purpose of having sex with CW3. On other

3

occasions, Workman sent CW3 pictures of himself and requested that CW3 send naked pictures to him. Workman instructed CW3 that if CW3 told anyone about their sexual relationship that any credit received for CW3's work with the drug task force would go away, and CW3 would go back to jail. During August of 2016, CW3 accidently broke the screen of CW3's cellphone. CW3 had texted with Workman using this cellular device, and had sent and received pictures from Workman of a sexual nature.

9.     On August 7 and 8, 2018, CW3 cooperated with law enforcement to send and receive text messages from CW3's cellular device to (276) 613-3680, known to CW3 as the work cellphone utilized by Workman. During the text conversation, CW3 is instructed to retrieve the previously broken cellphone, and dispose of the cellphone at CW3's workplace. These text messages are included as Attachment C.

10.     On August 8, 2018, records obtained from the Super 8 Hotel located in Richlands, Virginia showed that on August 24, 2016, Shade Workman rented a room from the hotel and utilized a Mastercard for the payment of the hotel room.

11.     On August 10, 2018, CW3 made a consensually recorded telephone call from CW3's cellular device to (276) 613-3680. Workman answered the telephone, and spoke with CW3. CW3 confirmed that the cellphone had been disposed of as previously directed.

12.     On August 13, 2018, Workman was interviewed by the Special Agents from the FBI at his office located in Tazewell County, Virginia. Workman was asked if he had ever had an inappropriate relationship with any confidential informant, and he answered "No." Workman was asked if he had ever had sex with a confidential informant, and he answered "No." Workman was asked if he had ever directed a confidential informant to dispose of any evidence, and he answered "No."

13.     CW1, W1, and CW3 were confirmed by Virginia State Police as having been open as confidential informants.

4

14.     Virginia State Police confirmed that cellular telephone with telephone number (276) 613-3680 is a telephone owned by the Virginia State Police and is assigned to and utilized by Workman.

15.     Tazewell County, Virginia is located in the Western Judicial District of Virginia.

16.     In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Verizon subscribers may be located on the computers of Verizon. Further, I am aware that computers located at Verizon contain information and other stored electronic communications belonging to unrelated third parties.

17.     Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon for weeks or months.

18.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon for short periods incident to and following their

5

transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

19.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

20.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

6

21.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

22.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

23.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

7

24.     As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to

8

the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

1.      I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

2.      Based on the forgoing, I request that the Court issue the proposed search warrant.


FURTHER THE AFFIANT SAYETH NOT

Respectfully submitted,

Special Agent MICAH J. CHILDERS
Federal Bureau of Investigation


Subscribed and sworn to before me on _September 4_____, 201 8

Honorable PAMELA MEADE SARGENT
United States Magistrate Judge

9

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with (276) 613-3680 that is stored at premises owned, maintained, controlled, or operated by Verizon, a wireless provider headquartered at 140 West Street, New York, New York.

2

## **ATTACHMENT B**

### **Particular Things to be Seized**

#### **I. Information to be disclosed by Verizon**

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon , regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to Verizon or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Verizon is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a) All voice mail, text, and multimedia messages May 1, 2016 until August 16, 2018 stored and presently contained in, or on behalf of the account or identifier;

b) All existing printouts from original storage of all of the text messages described above;

c) All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from May 1, 2016 until August 16, 2018;

d) All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message May 1, 2016 until August 16, 2018;

e) All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f) Incoming and outgoing telephone numbers, from May 1, 2016, until August 16, 2018;

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. §§ 242 (Deprivation of Rights Under Color of Law), Title 18 U.S.C. §§ 1512 (b)(1) and (b)(2)(B) (Obstruction of Justice; Witness Tampering and inducing the Destruction of Evidence), and Title 18 U.S.C. §§ 1001 (a)(2) (Materially False Statements to the Government) involving Shade Workman since May 1, 2016, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a) Communications between CW3 and Workman, where Workman directed CW3 to dispose of potential evidence.

b) Call records documenting a telephone call between CW3 and Workman.

c) Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

2

d) Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

e) Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

f) The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

g) The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the deprivation of rights under color of law, obstruction of justice, and/or materially false statements to the government, including records that help reveal their whereabouts.

3

## **Attachment C**

## **Text Messages**

1) The following text conversation was observed by law enforcement and conducted by

CW3 on August 7, 2018, between CW3's cellular device and telephone number (276)

613-3680:

4



(276) 613-3680

Messages
Today at ...

**Hey stranger I saw u today**

Hey

Been busy as always

**I think we might have a problem**

What's that

**Remember my phone that I busted josh charged and the damn thing came on and shade I still had pics of u on it**

**He's flipping out on me**

Still

It's been almost three years

Message

5



**TFW LTE**  5:48 PM

(276) 613-3680

Yes still u know how he is

I'm sorry

He never lets shit go

He's telling me that he's taking the phone to the commonwealth and telling them about us

Well his done enough as well

Wtf are we going to do to if does go I don't want to have to go back to court and lose all my credit for the shit I did and I really don't want to see u get any trouble

I miss talking to u

Yeah don't need to mess all the credit up

iMessage

6



**ı11 TFW LTE**     5:48 PM     0% 🔋

**< ③**

(276) 613-3680

Yeah don't need to mess all the credit up

Hopefully he want

> I told him what would happen to me if he did but I really hurt him I guess idk I'm worried

Hopefully he won't do that

> What if we can make sure he don't have the phone

Well get it

> He won't tell me where it is I think he has it at work

Oh ok

> U want to buy it from him to shut him up lol

iMessage

7



**TFW** LTE      5:48 PM

< 3

(276) 613-3680

U want to buy it from him to shut him up lol

What?

Blackmail

U know anything on him

No

Well what are we going to do I'm not going back to jail I'm worked to hard for where I am now

I'm not sure
Hopefully he won't do that to you

I think he's serious

U know what's on that phone

iMessage

8





2) The following text conversation was observed by law enforcement and conducted by CW3 on August 8, 2018, between CW3's cellular device and telephone number (276) 613-3680:

11


  
iMessage
Today 11:12 AM

> Hey I found the phone in the truck last night he's got to be so pissed 😡 when he finds out it's gone what should I do with it now

Oh lord. Tell him you aint seen it

> Well I don't want him to find it

Throw it away I guess

Take it to work and throw it

> Should I delete it first how do I get the shit off the cloud or whatever

I don't know nothing about cloud stuff?

  iMessage 

      

I'm an idiot when it comes to cell phones to be honest

I said there ain't no back up on it if no sd card

Ok sheewwww

Are u sure

I guess delete it and throw it away

Like at work or something

You still manager at Wendy's?

No I got a new job asst manger at the store

What store

Fast mart

iMessage

13


  
How's the boys? Probably 6 foot tall by now lol

They are good getting so big and they have my mouth and attitude poor kids they are in for it lol

Oh hell!
Playing football this year?

No I don't think so maybe basketball though

Middle school?

It hasn't been that long dumbass 3rd and 2nd

Delivered

Lol 
I'm old remember

Time flies the older you get!

iMessage

 


(276) 613-3680

Playing football this year?

> No I don't think so maybe basketball though

Middle school?

> It hasn't been that long dumbass 3rd and 2nd

Lol 😂
I'm old remember

Time flies the older you get!

> Yeah u r old

> Haha

**Delivered**

My hair is getting gray and gray

You looked amazing tho

  iMessage 

      



Middle school?

It hasn't been that long dumbass 3rd and 2nd

Lol 😂
I'm old remember

Time flies the older you get!

Yeah u r old

Haha

My hair is getting gray and gray

You looked amazing tho

I'll message u back after work k

Delivered

iMessage



17



(276) 613-3680

Are u busy

Training new guy

Can u talk

Not at the moment

Can I call u tmrw i'm heading home now just wanted to talk for a min

Yes
You working tomorrow

No I have to take Joshs mom to doc in Abington

Delivered

Ok well holler at me tomorrow

Be careful

18